## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DANIEL FOLEY,

        Plaintiff,

vs.                                                                         No. CIV 10-0203 RB/GBW

CITY OF ROSWELL, NEW MEXICO,
ROSWELL POLICE DEPARTMENT,
CRUZ ZAVALA, in his individual and
official capacity, GREG CARRASCO,
in his individual and official capacity, and
PETE HERNANDEZ, in his individual and
official capacity,

        Defendants.

### MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment,
(Doc. 122), filed on March 9, 2012. Briefing is complete. Jurisdiction arises under 28 U.S.C. §§
1331 and 1367. Having considered the submissions of counsel, the record, and relevant law, the
Court grants this Motion.

I.    **Background**

On June 24, 2007, Plaintiff Daniel Foley[1] watched his son play in a Gus Macker basketball
tournament in Roswell, New Mexico. During the game, Mr. Foley's son became involved in an
altercation on the basketball court. Believing his son was in danger, Mr. Foley rushed onto the
basketball court. The individual Defendants, who are police officers employed by Defendant City
of Roswell, arrested Mr. Foley and charged him with disorderly conduct, obstructing a police
officer, and resisting arrest under the Roswell City Code. The Roswell Municipal Court dismissed

---

[1] Mr. Foley was a member of the New Mexico House of Representatives from 1999 to 2009.

the criminal complaint on July 20, 2007.

Mr. Foley alleges that the individual Defendants physically assaulted him, unlawfully arrested him, conspired to draft false police reports to substantiate the false arrest, and wrongfully used the false police reports to institute criminal proceedings against him. According to Mr. Foley, the individual Defendants' primary motive in submitting the false police reports was to cover up their wrongful conduct in using excessive force to arrest him. Mr. Foley alleges that the Defendant City of Roswell maintained a custom or policy that permitted or condoned the constitutional violations. Mr. Foley claims that Defendants deprived him of due process and a liberty interest in his reputation protected by the Fourteenth Amendment, in violation of his federal constitutional rights under color of state law and he is therefore entitled to recovery, under 42 U.S.C. § 1983. Mr. Foley also alleges malicious abuse of process under state law. Mr. Foley requests compensatory and punitive damages, attorneys' fees, costs, and interest.

Defendants move for summary judgment on all claims based on qualified immunity, probable cause, lack of excessive force, and absence of municipal liability. Mr. Foley opposes Defendants' Motion for Summary Judgment.

## II.    Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases where the moving party will not bear the burden of persuasion at trial, it bears the initial responsibility of identifying an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Upon meeting this burden, the burden shifts to the non-movant to show specific facts supporting a genuine issue for trial as to all

of the essential elements of his case. *Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) ("The party opposing the motion must present sufficient evidence in specific, factual form . . . ."). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009).

## III.    Statement of Facts

The Court must view the facts in a light most favorable to Mr. Foley. *See Turner*, 563 F.3d at 1142. Thus, all reasonable inferences are drawn and factual ambiguities are resolved in Mr. Foley's favor.

On June 24, 2007, Mr. Foley's thirteen year-old son, Tim Foley, played in a Gus Macker three-on-three basketball tournament in the parking lot of the Roswell Mall. (Deposition of Daniel Foley at 10-11; 13;14; 38, Def. Ex. 1, Pl. Ex. 3). Mr. Foley is a former Marine who stands five feet, nine inches tall. (Foley Dep. at 7; 10). At the time of the incident, Mr. Foley was thirty-seven years old and weighed approximately 195-200 pounds. (Foley Dep. at 10).

During the championship game, close to fifty spectators crowded around the court as two players on opposite teams started to scuffle, and several persons came onto the basketball court. (Foley Dep. at 15-16; Deposition of Martin Cooper at 14, Def. Ex. 2). As Tim Foley approached the altercation, Coach Bryan Clay, who coached the opposing team, raised his hand and hit Tim Foley in the chest and knocked him to the ground. (Foley Dep. at 16; 20; 41). Coach Sean Schooley, the coach of Tim Foley's team, observed Coach Clay put his arm out in a "stiff arm" position, and saw Tim Foley run into Coach Clay's hand. (Deposition of Sean Schooley at 27-28, Def. Ex. 3). Coach Schooley surmised that Coach Clay intended to keep Tim Foley away from

the ongoing scuffle. (Schooley Dep. at 27-28;44-45). Michele Lyons, a friend of Mr. Foley and a spectator, perceived that Coach Clay tried to keep the teenaged players from fighting. (Deposition of Michele Lyons at 16, Def. Ex. 5). As a result of the contact between Tim Foley's chest and Coach Clay's hand, Tim Foley fell to the ground on his back, landing on his posterior and hands. (Foley Dep. at 40). Tim Foley got up on his toes and hands and moved backwards in a crab-walk. (Foley Dep. at 16-17).

Mr. Foley perceived that Coach Clay took a couple of steps towards Tim Foley. (Foley Dep. at 16-17). From Mr. Foley's vantage point, it appeared that Coach Clay "squared up" with, or took an aggressive stance, with Tim Foley. (Foley Dep. at 20). Mr. Foley quickly walked about three steps onto the court and loudly told Coach Clay to "take his fucking hands off my kid" or "don't you fucking touch my son" or "get your fucking hands off my son." (Foley Dep. at 17; 26; 43-45). Mr. Foley pointed at Coach Clay as he issued these commands and walked toward Coach Clay. (Foley Dep. at 52). About a minute to a minute and a half elapsed between the start of the scuffle and the time Mr. Foley walked onto the court. (Foley Dep. at 36).

Mr. Foley uttered the profanities loud enough so that Coach Clay, who was about fifteen feet away from Mr. Foley, could hear the words. (Foley Dep. at 45-48). Coach Schooley, Ms. Lyons, and Rhonda Cooper, who was a spectator and Mr. Foley's friend, heard Mr. Foley make the statements. (Schooley Dep. at 28; 47-48; Lyons Dep. at 35; Deposition of Rhonda Cooper at 36-37). Ms. Lyons perceived that Mr. Foley was upset as he walked briskly onto the basketball court with his arms raised. (Lyons Dep. at 39-41). Coach Clay perceived that Mr. Foley acted viciously and intended to punch him. (Affidavit of Byan Clay, Def. Ex. 6).

Defendant Officer Pete Hernandez observed Mr. Foley charge onto the basketball court

while he cursed loudly in an aggressive manner.  (Deposition of Pete Hernandez at 56, Def. Ex.

7).  Defendant Officer Greg Carrasco saw Mr. Foley quickly walk onto the court toward the

scuffle in an aggressive manner while yelling "he hit my fuckin' kid, he hit my fuckin' kid."

(Deposition of Greg Carrasco at 102-103; 111-112, Def. Ex. 8).  Due to the manner in which Mr.

Foley was moving, it appeared to Officer Carrasco that Mr. Foley was going after a person who

hit his son and Mr. Foley intended to harm that person. (Carrasco Dep. at 102-103; 155).  Ms.

Lyons testified in her deposition "I've seen fights break out.  You've got one team against another

team.  It could have gotten really, really ugly."  (Lyons Dep. at 28-29).

    Defendant Officer Cruz Zavala heard Mr. Foley yelling and got in front of him.

(Deposition of Cruz Zavala at 62-63, Def Ex. 9).  Coach Schooley saw Officer Zavala get in front

of Mr. Foley and two other officers try to bring Mr. Foley down. (Schooley Dep. at 52-53).

Coach Clay saw officers trying to stop Mr. Foley and Mr. Foley resisting the officers.  (Clay Aff.).

Officer Carrasco pushed his knee into the back of Mr. Foley's knee and Officer Carrasco and

Officer Hernandez pulled Mr. Foley to the ground on his back.  (Carrasco Dep. at 103-104; 169-

70).  Mr. Foley was about ten to fifteen feet from Coach Clay when the officers stopped him.

(Schooley Dep. at 63-64).

    Officer Hernandez squatted down next to Mr. Foley with a leg over his chest and his knee

to Mr. Foley's throat.  (Foley Dep. at 59; 82).  Officer Hernandez yelled at Mr. Foley to calm

down.  (Foley Dep. at 82).  Mr. Foley saw a holster with a gun and realized that Officer

Hernandez was a law enforcement officer. (Foley Dep. at 82-83).  Officer Hernandez was not in a

standard police uniform, but he wore a white polo shirt with a small embroidered badge on the

front and the word "police" emblazoned across the back.  (Foley Dep. at 84).  Officer Hernandez

grabbed Mr. Foley's arms, rolled Mr. Foley over onto his stomach, and handcuffed Mr. Foley behind his back. (Foley Dep. at 60). Officer Hernandez arrested Mr. Foley for disorderly conduct, obstructing a police officer, and resisting arrest, under Sections 10-48, 10-50, and 10-88 of the Roswell City Code. (Hernandez Dep. at 61; 67-68).

According to Mr. Foley, he did not resist arrest. (Foley Dep. at 61-62). However, Officer Hernandez and Officer Zavala recalled that Mr. Foley did resist arrest. (Zavala Dep. at 72-73; Hernandez Dep. at 68; 71-72 ). Ms. Lyons observed that Mr. Foley struggled while he was being arrested. (Lyons Dep. at 17). Ms. Cooper does not recall seeing Mr. Foley voluntarily raising his hands and assumed that the officers grabbed his hands for handcuffing. (R. Cooper Dep. at  46-47). Martin Cooper, a spectator and friend of Mr. Foley, as well as Ms. Cooper, and Ms. Lyons, who all witnessed the incident, observed that the officers did nothing beyond what was necessary to place Mr. Foley under arrest. (Deposition of Martin Cooper at 58, Def. Ex. 2; R. Cooper Dep. at 59; Lyons Dep. at 50-51, 66-67).

Mr. Foley repeatedly asked Officer Hernandez if his son was alright. (Foley Dep. at 62-63). Officer Hernandez helped Mr. Foley up and they walked off the court. (Foley Dep. at 64). Officer Hernandez escorted Mr. Foley to a room in the mall, removed the handcuffs, moved Mr. Foley's hands in front of Mr. Foley, handcuffed Mr. Foley with his hands in front, and sat Mr. Foley in a chair. (Foley Dep. at 66). Mr. Foley used his cell phone to call his friend, Mickey Barnett, who is an attorney. (Foley Dep. at 66). Mr. Barnett suggested that Mr. Foley should ask for a pen and pad, stay calm, and not say anything. (Foley Dep. at 66-67). Mr. Foley asked for, and received, a pen and paper from a security guard who was present in the room. (Foley Dep. at 67). After about thirty minutes, Mr. Foley asked if he could leave. (Foley Dep. at 68).

Mr. Foley was told he was being arrested.  (Foley Dep. at 68).  Mr. Foley asked Defendant

Officer Cruz Zavala what Mr. Foley had done and Officer Zavala responded Mr. Foley had done

plenty and he could read about it in the report.  (Foley Dep. at 90).

  Officer Zavala patted Mr. Foley down, walked Mr. Foley to a police car with Officer

Zavala's hand on Mr. Foley, put Mr. Foley in the police car, and drove him to the police station.

(Foley Dep. at 69; 74).  Officer Zavala placed his hand on Mr. Foley and walked him into the

police station. (Foley Dep. at 74).  Officers took off the handcuffs to fingerprint Mr. Foley at the

police station and put them back on.  (Foley Dep. at 92-93).  At the detention center, the

handcuffs were taken off for additional fingerprinting and then Mr. Foley was handcuffed to a

metal bench at the detention center. (Foley Dep. at 93).  The detention officer also took a mug

shot of Mr. Foley.  (Foley Dep. at 94).  Mr. Foley remained handcuffed to the bench until he was

picked up. (Foley Dep. at 93).  The handcuffs were not applied too tightly and they did not injure

Mr. Foley.  (Foley Dep. at 93).

  The employees at the detention center were very nice to Mr. Foley.  (Foley Dep. at 94).

Mr. Foley had toured the facility about six months prior to the incident. (Foley Dep. at 94).

Detention center personnel recognized Mr. Foley as a state representative. (Foley Dep. at 94).

The supervisor said that the newspaper had called multiple times to ascertain when Mr. Foley

would be released.  (Foley Dep. at 94-95).  He was not placed in a cell and he did not have to

change into jail garb. (Foley Dep. at 95).  Mr. Foley was not physically injured while he was at the

detention center.  (Foley Dep. at 96).  Mr. Foley was at the detention center for less than an hour

and a half.  (Foley Dep. at 95).  He was released at 8:26 p.m. on a $900 surety bond.  (Foley Dep.

at 96-99).  The entire incident, from arrest to release on bond, lasted slightly less than three hours.

(Foley Dep. at 97).

Mr. Foley is no longer a state representative.  (Foley Dep. at 124).  He feels that the media coverage of the incident played a role in his loss of the 2008 primary election.  (Foley Dep. at 133-34).  However, Mr. Foley is not claiming the loss of the election as part of his damages or injuries in this lawsuit.  (Foley Dep. at 134).  Mr. Foley and his family moved.  (Foley Dep. at 124).  Mr. Foley frequently must explain the incident and disclose his arrest record.  (Foley Dep. at 129).  As a result of the incident, Tim Foley feels like he ruined Mr. Foley's life.  (Foley Dep. at 124).  Mr. Foley's younger children do not trust police officers and Mr. Foley does not have friendly feelings when he encounters police officers.  (Foley Dep. at 129-30).  Mr. Foley believes people and his friends look at him differently, he loses sleep thinking about the incident, his health has declined, and he gained weight after the incident.  (Foley Dep. at 130-131).

## IV.    Discussion.

### A.    Qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity represents "the norm for public officials, and serves to insulate from suit "all but the plainly incompetent or those who knowingly violate the law."  *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (internal quotations and citations omitted).  "[P]ublic employees who are just doing their jobs are generally immune from suit."  *Id*. at 1230.

"A plaintiff can overcome this presumption of immunity only by carrying the heavy burden

of showing both that (1) the defendant-officer in question violated one of his constitutional rights,
and (2) the infringed right at issue was clearly established at the time of the allegedly unlawful
activity such that 'every reasonable official would have understood that what he [was] doing'
violated the law." *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011) (*quoting Ashcroft v.
al–Kidd*, ____U.S. ____, 131 S.Ct. 2074, 2080, 2083 (2011)). "If, and only if, the plaintiff meets
this two-part test does a defendant then bear the traditional burden of the movant for summary
judgment-showing that there are no genuine issues of material fact and that he . . . is entitled to
judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal
quotation marks omitted). "Failure on either qualified immunity element is fatal to the plaintiff's
cause." *Kerns*, 663 F.3d at 1180.

Notably, Mr. Foley's case involves claims of both unlawful arrest and excessive force
arising from a single encounter. The Tenth Circuit has explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from
> a single encounter, it is necessary to consider both the justification the officers had for
> the arrest and the degree of force they used to effect it. If the plaintiff can prove that
> the officers lacked probable cause, he is entitled to damages for the unlawful arrest,
> which includes damages resulting from any force reasonably employed in effecting the
> arrest. If the plaintiff can prove that the officers used greater force than would have
> been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting
> from that excessive force. These two inquiries are separate and independent, though
> the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest
> claim, the excessive force claim, both, or neither.

*Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007) (en banc).

It bears underscoring that, although the Court must construe the facts in the light most
favorable to the plaintiff as the non-moving party, "a plaintiff's version of the facts must find
support in the record." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).
"[M]ore specifically, as with any motion for summary judgment, when opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Id.* (internal quotation marks omitted).

**B.    Defendants are entitled to qualified immunity on the unlawful arrest claim.**

Mr. Foley asserts that Officer Hernandez, Officer Carrasco, and Officer Zavala (the Individual Defendants) unlawfully arrested him in violation of the Fourth Amendment. Because an arrest is "the most intrusive of Fourth Amendment seizures," an arrest is "reasonable only if supported by probable cause." *United States v. White*, 584 F.3d 935, 945 (10th Cir. 2009) (internal quotation marks omitted). Accordingly, "[i]t has long been established that an arrest . . . without probable cause that a crime has been committed violates the Fourth Amendment." *Shroff v. Spellman*, 604 F.3d 1179, 1188 (10th Cir. 2010). Thus, the crucial question is whether the arrest was supported by probable cause.

"Probable cause exists where the facts and circumstances, within the arresting officer's knowledge and of which they had reasonably trustworthy information, are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested." *United States v. Alonso*, 790 F.2d 1489, 1496 (10th Cir.1986). This is an objective standard, and thus "[t]he subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004). Whether a reasonable officer would believe that there was probable cause to arrest in a given situation is based on the totality of the circumstances. *Id.* at 897.

The undisputed facts, viewed in the light most favorable to Mr. Foley, support a finding of

probable cause to arrest Mr. Foley for disorderly conduct under Section 10-88 of the Roswell

City Code, which provides: "(a) Disorderly conduct consists of: (1) Engaging in violent, abusive,

indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to

disturb the peace . . . . (b) It is unlawful to commit disorderly conduct."  Roswell City Code, §

10-88.  Mr. Foley rushed onto the basketball court, pointed at Coach Clay, and loudly ordered

Coach Clay to "take his fucking hands off" his son.  Mr. Foley uttered the profanities loud enough

so that Coach Clay, as well as bystanders and Officer Zavala, could hear his words.  Ms. Lyons

perceived that Mr. Foley was upset and raised his arms.  Coach Clay perceived that Mr. Foley

intended to punch him.  Viewed objectively, and in the light most favorable to Mr. Foley, the

totality of the facts of record establish that Mr. Foley engaged in disorderly conduct as defined by

Roswell City Code, § 10-88.  In that reasonable law enforcement officers on the scene would

perceive that Mr. Foley engaged in disorderly conduct, the arrest was supported by probable

cause.

If probable cause exists as to one charged crime, police officers are justified in arresting

that person, and it is immaterial whether there was probable cause to arrest for other crimes.  *See*

*Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1080 (8th Cir. 1990); *Marrs v. Boles*, 51

F.Supp.2d 1127, 1135 (D. Kan.1998).  In that the Court finds probable cause existed to arrest

Mr. Foley on the disorderly conduct charge, it is unnecessary to discuss the evidence relating to

resisting arrest or obstructing an officer.  Nonetheless, the evidence of record, construed in the

light most favorable to Mr. Foley, establishes that probable cause existed to charge Mr. Foley

with resisting arrest and obstructing the police officers.

Section 10-48 of the Roswell City Code states: "(a) Obstructing an officer consists of: (1)

11

Knowingly obstructing, resisting or opposing any officer of this state or any other duly authorized

person serving or attempting to serve or execute any process or any rule or order of any of the

courts of this state or any other judicial writ of process; or (2) Resisting, obstructing or abusing

any judge, magistrate, or peace officer in the lawful discharge of his duties . . . . (b) It is unlawful

to resist or obstruct an officer."  Roswell City Code, § 10-48.  Section 10-50 of the Roswell City

Code states: "It is unlawful to resist a lawful arrest."  Roswell City Code, § 10-50.

 Mr. Foley testified in his deposition that he did not resist arrest.  However, Mr. Foley's

perception is not dispositive as "the probable cause inquiry is an objective one."  *Morris v. Noe,*

672 F.3d 1185, 1192 (10th Cir. 2012).  Officer Hernandez and Officer Zavala perceived that Mr.

Foley resisted arrest.  Ms. Lyons observed that Mr. Foley struggled while he was being arrested.

Ms. Cooper does not recall seeing Mr. Foley voluntarily raise his hands and she assumed that the

officers had to grab his hands to handcuff him.  Viewed objectively and in the light most favorable

to Mr. Foley, the facts of record establish that the police officers had probable cause to arrest Mr.

Foley.  Because Mr. Foley has not identified facts supporting the conclusion that his constitutional

right to be free from unlawful arrest was violated, the Individual Defendants are entitled to

qualified immunity and summary judgment on Mr. Foley's Fourth Amendment claim of unlawful

arrest.

**C.**     **Defendants are entitled to qualified immunity on the excessive force claim.**

"Excessive force claims are governed by the Fourth Amendment's 'objective

reasonableness' standard."  *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010).

Under this standard, "the question is whether the officers' actions are 'objectively reasonable' in

light of the facts and circumstances confronting them, without regard to their underlying intent or

motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The ultimate issue is whether the officers' use of force was objectively reasonable in light of the surrounding facts and circumstances as seen from the perspective of a reasonable officer at the scene. *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005) (*citing Graham*, 490 U.S. at 388). "More specifically, courts determine whether the officer's use of force was reasonable given the severity of the suspected crime, the immediate threat to the officer or others, and whether the suspect was actively resisting arrest or evading arrest by flight." *Cavanaugh*, 625 F.3d at 664 (*citing Graham*, 490 U.S. at 396 and *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281-82 (10th Cir. 2007)). Courts "judge the reasonableness of a particular use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Morris*, 672 F.3d at 1195 (*quoting Graham*, 490 U.S. at 396).

In this case, the Individual Defendants were presented with a highly volatile and potentially dangerous situation. A scuffle had broken out between players on the basketball court surrounded by spectators. Into the midst of the fray, Mr. Foley rushed at Coach Clay while yelling profanities. In light of these facts, reasonable officers could surmise that Mr. Foley intended to harm Coach Clay and precipitate a fight, thereby posing an immediate threat to their safety. *Graham*, 490 U.S. at 396. Mr. Foley was not cooperative; rather he was on a rampage. In response to this imminent threat, Officer Zavala got in front of Mr. Foley, Officer Carrasco pushed his knee into the back of Mr. Foley's knee, and Officer Carrasco and Officer Hernandez pulled Mr. Foley to the ground from behind. Mr. Foley sustained no physical injuries as a result of the arrest and detention. Mr. Cooper, Ms. Cooper, and Ms. Lyons observed that the officers did nothing beyond what was necessary to place Mr. Foley under arrest. Based on the foregoing,

the Court concludes that the application of force, and the amount of force used, by the Individual Defendants was objectively reasonable. Because the Court finds that Mr. Foley has not identified facts supporting the conclusion that his constitutional right to be free of excessive force was violated, the Individual Defendants are entitled to qualified immunity and summary judgment on Mr. Foley's Fourth Amendment claim of excessive force.

**D.      Malicious abuse of process.**

Law enforcement officers may be liable under 42 U.S.C. §1983 "when they conspire to procure groundless state indictments and charges based upon fabricated evidence or false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about a citizen's trial or conviction." *Anthony v. Baker*, 767 F.2d 657, 662 (10th Cir. 1985). The Court has determined that the arrest of Mr. Foley was lawful and the officers used reasonable force to effectuate the arrest. The charges were supported by probable cause. No facts of record indicate that the Individual Defendants conspired to draft false police reports or used false police reports to institute criminal proceedings against Mr. Foley. Viewed in the light most favorable to Mr. Foley, the facts of record do not support a claim for malicious abuse of process under §1983 or state law. As the claims for malicious abuse of process are without factual support, Defendants are entitled to summary judgment on these claims.

**E.      Liberty interest in reputation.**

The Fourteenth Amendment provides that citizens may not be deprived of life, liberty, or property without due process. *See Chambers v. Colo. Dep't of Corr.*, 205 F.3d 1237, 1242 (10th Cir. 2000). While an individual has a protected liberty interest in his reputation, "defamation, standing alone, [is] not sufficient to establish a claim for deprivation of a liberty interest." *Renaud*

14

*v. Wyo. Dep't of Family Servs.*, 203 F.3d 723, 726–27 (10th Cir. 2000). Rather, a plaintiff must show that "the damage to his reputation is combined with an injury to a right or status established by state law." *Doe v. Bagan*, 41 F.3d 571, 575 (10th Cir. 1994). More specifically, to state a claim of denial of due process based on the government's impugning of a plaintiff's "good name, reputation, honor, or integrity," a plaintiff must show facts sufficient to establish the following: (1) the government made a statement about him that is sufficiently derogatory to injure his reputation, that is false, and (2) the plaintiff has experienced some governmentally imposed burden that "significantly altered [his] status as a matter of state law." *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004) (citations omitted).

The Court has determined that the arrest of Mr. Foley was lawful and the Individual Defendants used reasonable force to effectuate the arrest. The charges were supported by probable cause. No facts of record indicate that the Individual Defendants conspired to draft false police reports, drafted false police reports, or used false police reports to institute criminal proceedings against Mr. Foley. Viewed in the light most favorable to Mr. Foley, the facts of record do not support a claim for injury or damage to Mr. Foley's liberty interest in his reputation. Accordingly, Defendants are entitled to summary judgment on this claim.

**F.    Municipal liability.**

"A plaintiff suing a municipality under 42 U.S.C. § 1983 for the actions of one of its officers must prove: (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004) (*citing Myers v. Okla. Cnty. Bd. of County Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998)). Because the Court has determined

that the Individual Defendants did not commit a constitutional violation against Mr. Foley, the City of Roswell cannot be liable under § 1983. *See id.* (*citing City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).  Defendants are entitled to summary judgment on the municipal liability claim.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 122), filed on March 9, 2012, is **GRANTED.**

**IT IS FURTHER ORDERED** that a judgment consistent with this Memorandum Opinion and Order will issue forthwith.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**